**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:21-CR-00264 |
| v. | (Chief Judge Brann) |
| BRYCE RICHARD STANGER and TANYA JAYNENE STANGER, | |
| Defendants. | |

**MEMORANDUM OPINION**

**JANUARY 27, 2023**

## I.  BACKGROUND

In February 2022, Bryce Stanger ("Bryce") and Tanya Stanger ("Tanya") (collectively "Defendants") were indicted for conspiracy to distribute and possess with the intent to distribute controlled substances—those being 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine and 400 grams and more of a mixture and substance containing a detectable amount of fentanyl—in violation of 21 U.S.C. § 846, possession with intent to distribute 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and 841(b)(1)(A), and possession with intent to distribute 400 grams and more of a mixture and substance

containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 841(a)(1), and 841(b)(1)(A).[1] The Indictment also contains a forfeiture allegation for currency.[2]

The Indictment arose from an incident that occurred at approximately 9:00 a.m. on August 25, 2021, when Pennsylvania State Police Corporal Mark Conrad utilized a handheld radar unit to measure a 2014 Kia Forte (the "Kia") traveling at a speed of 79 miles per hour on a portion of Interstate 80 that had a posted speed limit of 70 miles per hour.[3] As the Kia approached Corporal Conrad, it abruptly slowed to 69 miles per hour, and Corporal Conrad noted that the Kia "was equipped with extremely dark side window tint" that prevented him from seeing inside the vehicle.[4] Corporal Conrad also observed "that the Kia was equipped with a clear registration plate cover over the registration that put a glare on the registration making it difficult to read."[5] Corporal Conrad then began to pursue the vehicle and noticed that it appeared to be traveling well below the speed limit; he also ran the Kia's registration and discovered that it was registered in San Ysidro, California.[6]

Corporal Conrad stopped the Kia and obtained its registration, which was less than one month old.[7] He then directed the driver, Tanya, to exit the vehicle and stand

---

[1]   Doc. 4.
[2]   *Id.* at 5-6.
[3]   Doc. 66-1 at 8. Unless contradicted or supplemented by Corporal Conrad's testimony at the January 18, 2023 suppression hearing, the Court cites to Corporal Conrad's offense report dated September 16, 2021, located at Doc. 66-1.
[4]   *Id.* The Government's suppression hearing exhibits 24 and 25 demonstrate extremely dark window tinting that makes it difficult to see within the Kia from the exterior.
[5]   Doc. 66-1 at 8.
[6]   *Id.*
[7]   *Id.*

by the passenger window of his vehicle.[8] Corporal Conrad informed Tanya that he had pulled her over for speeding, but that he intended to provide her with a warning.[9] Tanya apologized for speeding but then began, as Corporal Conrad described it, "to ramble" about various subjects.[10]

Corporal Conrad asked Tanya where she and her husband, Bryce, were traveling from, and she replied that they had left California before volunteering that they were traveling to New York to see a concert.[11] Tanya then further volunteered that the concert had been cancelled.[12] When asked what concert they were going to attend, Tanya responded "umm, Staind."[13] Corporal Conrad inquired as to why the concert had been canceled, and Tanya responded "Covid and the weather," then, in response to Corporal Conrad's inquiry as to where the concert was supposed to have occurred, Tanya stated "umm like downtown," laughed, shrugged her shoulders, and said "it just said New York."[14] Corporal Conrad asked what else Tanya and her husband would do in New York City, to which Tanya "shrugged her shoulders" and "related that it is just a getaway from work."[15]

---

[8]  *Id.*
[9]  *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

Tanya again began to ramble about other subjects before Corporal Conrad asked how long Defendants had owned the Kia—Tanya stated that they had owned it for "about a month"; Corporal Conrad then inquired from where they had purchased the Kia, and Tanya answered that Bryce had purchased it from a friend.[16] When asked what type of vehicle the Kia was, Tanya "looked at the rear of the vehicle where the make and model is displayed, and then replied, 'a Kia Forte.'"[17] When asked how much the Kia had cost, Tanya replied that she was unsure, but "I think [Bryce] got it for like four or five [thousand dollars], it's a salvage."[18]

Corporal Conrad asked what Defendants planned to do in New York City, and Tanya responded that they planned to sight see for a "couple of days, maybe like two or three."[19] Tanya was unaware of when the concert they had planned to attend was canceled, and noted only that "we checked a couple of days ago, or maybe it was like yesterday or two days ago we checked, and [Bryce] saw that" it had been canceled.[20] Tanya then stated "that they do not have anything planned and do not have a hotel reservation in New York."[21] During this questioning, Corporal Conrad "conducted a criminal history check and discovered that [Tanya] had been arrested multiple times for felony drug charges."[22]

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* at 9.
[22] *Id.*

During the entire time that Corporal Conrad was speaking with Tanya, he was checking the Kia's registration, running Tanya's driver's license information, checking her criminal history and any documentation, and reading information.[23] Corporal Conrad explained that his system runs through an online network and the area in which the traffic stop occurred had limited connectivity, which slowed down the process of completing those tasks.[24]

Corporal Conrad then directed Tanya to sit back in the driver's seat of the Kia and requested that Bryce stand next to the passenger window of Corporal Conrad's vehicle.[25] As Bryce exited the vehicle, Corporal Conrad observed him furtively whisper something to Tanya.[26] When Corporal Conrad asked Bryce why he and Tanya were traveling, Bryce stated that they were picking up his grandmother in Hazelton, Pennsylvania, and the three would then drive to Florida to spread his mother and father's ashes.[27] During this time Corporal Conrad ran a criminal history check on Bryce and discovered that he had multiple prior arrests for felony drug charges.[28]

Corporal Conrad asked if there were any narcotics in the Kia, which Bryce denied; Bryce further refused Corporal Conrad's request to search the Kia.[29] Once

---

[23]   Corporal Conrad testimony at suppression hearing.
[24]   Corporal Conrad testimony at suppression hearing.
[25]   Doc. 66-1 at 9.
[26]   *Id.*
[27]   *Id.* at 10.
[28]   *Id.*
[29]   *Id.*

backup arrived, Corporal Conrad deployed his certified drug detection canine who displayed alert behavior several times, indicating the presence of illegal narcotics.[30] Corporal Conrad then placed Defendants under arrest and provided them with their *Miranda*[31] warnings.[32] Subsequent searches of the Kia uncovered approximately thirty pounds of methamphetamine, one kilogram of fentanyl, and a large amount of currency.[33]

In February 2022, Defendants filed a motion suppress all evidence seized by law enforcement from the Kia, and to suppress any pre-*Miranda* statements given by Defendants to law enforcement.[34] In January 2023, this Court conducted a hearing on Defendants' motion to suppress so that it could receive testimony from any witnesses and render credibility assessments, if necessary; the sole witness presented was Corporal Conrad.[35] The motion to suppress is now ripe for disposition and, for the following reasons, that motion will be denied.

## II.   DISCUSSION

With respect to any motion to suppress, "[a]s a general rule, the burden of proof is on the defendant who seeks to suppress evidence . . . [and] only once the

---

[30]  *Id.* at 11.
[31]  *Miranda v. Arizona,* 384 U.S. 436 (1966).
[32]  Doc. 66-1 at 11.
[33]  Doc. 66 at 52.
[34]  Docs. 40, 41.
[35]  Having conduct that hearing, the Court finds that Corporal Conrad's testimony was credible.

defendant has established a basis for his motion does the burden shift to the government to show the search was reasonable."[36]

## A.    Whether Evidence Should be Suppressed

Defendants argue that suppression of any evidence seized from the Kia is appropriate because Corporal Conrad unreasonably extended the duration of the traffic stop, as there was no reasonable, articulable suspicion of criminal activity that would justify Corporal Conrad in detaining Defendants for approximately 50 minutes—well beyond the time required for a traffic stop.[37]

The Government responds that Corporal Conrad was performing activities needed to address the traffic stop while he was questioning Tanya, including checking Tanya's driver's license, checking the automobile's registration and proof of insurance, and checking Tanya's criminal history.[38] The Government contends that, after that was completed, Corporal Conrad had developed a reasonable suspicion that Defendants were drug mules, and he therefore legitimately expanded

---

[36]  *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (internal citation and quotation marks omitted).

[37]  Doc. 41 at 2-6. Defendants initially argued that suppression was warranted because there was insufficient cause for the initial traffic stop. Doc. 41 at 1-2. However, counsel wisely abandoned that argument at the suppression hearing. Even if this argument has not been abandoned, the Court would find that the initial traffic stop was justified. It is well established that a traffic stop "may be initiated based on a reasonable suspicion that a traffic violation has occurred." *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018). Here, there is little doubt that Corporal Conrad had a reasonable suspicion that a traffic violation occurred, as the Kia was traveling 79 miles per hour in a 70-mile-per-hour-zone, in violation of 75 Pa. Stat. and Cons. Stat. § 3362(a), and appeared to have excessive window tinting, in violation of 75 Pa. Stat. and Cons. Stat. § 4524(e)(1).

[38]  *Id.* at 26-28.

the scope of the traffic stop by the time he finished speaking with Tanya.[39] The Government further asserts that the drug detection canine's alerts while performing an open-air sniff of the Kia provided sufficient probable cause to search the Kia.[40]

Turning to the question of whether the traffic stop was unreasonably extended, "[i]n the context of traffic stops, the Supreme Court has made clear that 'the tolerable duration of the stop is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns.'"[41] "'A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation.'"[42] "To prolong a stop beyond that point, the officer must have acquired reasonable suspicion during the mission to justify further investigation."[43] "With regard to what questions an officer may ask, the Supreme Court has stated that 'inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.'"[44]

---

[39] *Id.* at 28-48.

[40] *Id.* at 48-53.

[41] *Yoc-Us v. Att'y Gen. U.S.*, 932 F.3d 98, 104 (3d Cir. 2019) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (brackets omitted)).

[42] *Id.* (quoting *Rodriguez*, 575 U.S. at 350-51 (brackets omitted).

[43] *Id.* (internal quotation marks omitted).

[44] *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (ellipsis omitted)).

"'Beyond determining whether to issue a traffic ticket,' [the mission of a traffic stop] includes 'ordinary inquiries incident to the traffic stop.'"[45] "These incidental inquiries typically involve checking the driver's license and any outstanding warrants against the driver, as well as inspecting the vehicle's registration and insurance."[46] "They are considered part of the traffic stop's mission because they serve its ultimate objective—to ensure roadway safety."[47] "Tasks tied to officer safety are also part of the stop's mission when done out of an interest to protect officers."[48] However, "[n]ot all inquiries during a traffic stop qualify as ordinarily incident to the stop's mission. In particular, those 'measures aimed at detecting evidence of ordinary criminal wrongdoing' do not pass muster."[49]

Here, the available evidence sufficiently establishes that the first approximately thirteen and one-half minutes of the traffic stop—during which time Corporal Conrad spoke with Tanya—were dedicated to the mission of the traffic stop. Although Corporal Conrad quickly determined that he would likely issue only a warning for speeding,[50] he then inquired about Defendants' travel plans, and the United States Court of Appeals for the Third Circuit has "held that some questions

---

[45]  *United States v. Clark*, 902 F.3d 404, 410 (3d Cir. 2018) (quoting *Rodriguez*, 575 U.S. at 355 (brackets omitted)).

[46]  *Id.*

[47]  *Id.*

[48]  *Id.*

[49]  *Id.* (quoting *Rodriguez*, 575 U.S. at 355 (brackets omitted)).

[50]  Doc. 66-1 at 8.

relating to a driver's travel plans ordinarily fall within the scope of the traffic stop."[51] Furthermore, Corporal Conrad's subsequent decision to check Tanya's driver's license and criminal history[52] was justified as part of the traffic stop.[53] Corporal Conrad asked, however, a number of questions that may well have exceeded the scope of the traffic stop, including numerous questions related to the Kia, its purchase history, who had sold the vehicle to Bryce, and when Tanya had discovered that the concert she stated she wished to attend had been canceled.[54]

Nevertheless, these extraneous questions were asked while Corporal Conrad ran a license and criminal history check on Tanya and conducted other activities related to the traffic stop—not only did Corporal Conrad assert in his report that "[a]s I was questioning [Tanya], I conducted a criminal history check,"[55] but it is evident from the video footage of the traffic stop that Corporal Conrad was continually typing information into his keyboard while speaking with Tanya. Corporal Conrad then ceased his questioning of Tanya once those checks were completed. Even if many of Corporal Conrad's questions could be deemed extraneous, they did not in any manner extend the length of the stop. Therefore, nothing improper occurred by virtue of that questioning, as "'inquiries into matters

---

[51] *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020).
[52] Doc. 66-1 at 9.
[53] *Clark*, 902 F.3d at 410. *See also United States v. Frierson*, 611 F. App'x 82, 85 (3d Cir. 2015) (holding that "any preliminary delay in checking Frierson's license, registration, and criminal history was justified as part of the stop").
[54] Doc. 66-1 at 8-9.
[55] *Id.* at 9.

unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.'"[56]

Because Corporal Conrad was acting within the scope of the traffic stop during the entirety of his discussion with Tanya, the Court must determine whether, based on that conversation and the events preceding it, he "acquired reasonable suspicion" of criminal activity sufficient "to justify further investigation."[57] To acquire reasonable suspicion "law enforcement officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information,' but must act on more than 'a mere hunch' to meet the reasonable suspicion standard for their stop."[58]

During the initial stop and subsequent conversation with Tanya, Corporal Conrad observed:

1.   The Kia appeared to have excessively tinted windows, which prevented Corporal Conrad from observing the inside of the vehicle. From training and experience, Corporal Conrad believes that excessive window tint is a common indicator of vehicles used to transport contraband;

2.   Defendants were traveling along Interstate 80, a known drug trafficking corridor;

---

[56]   *Yoc-Us*, 932 F.3d at 104 (quoting *Johnson*, 555 U.S. at 333 (ellipsis omitted)).
[57]   *Clark*, 902 F.3d at 410.
[58]   *United States v. Mathurin*, 561 F.3d 170, 174 (3d Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002)).

3.    The Kia was speeding prior to passing Corporal Conrad's position and slowed down to well below the speed limit after passing Corporal Conrad;

4.    The Kia was a common make and model and had a plain appearance. The vehicle had no dealership markings, license plate bracket or personalized markings, such as bumper stickers or decals. From training and experience, Corporal Conrad believes that drug couriers often use "common" and "plain" vehicles so that the vehicles blend in with the public;

5.    As Corporal Conrad followed the Kia, he performed a check of the vehicle's registration which showed that the Kia was registered in San Ysidro, California, which borders Mexico. Mexico and California are known source areas for narcotics, and a large percentage of illegal narcotics found in the United States are smuggled across the Mexican border;

6.    The Kia's license plate was covered by a clear plastic plate cover, which caused a glare and made the license plate difficult to read. From training and experience, Corporal Conrad believes that drug trafficking organizations commonly use clear license plate covers to evade detection. The glare or reflection from the plastic covering makes it difficult for a License Plate Recognition ("LPR") system, which captures photographic or video images of license plates, to read the license plate number. Plastic covers are commonly placed on the "work vehicles" of drug trafficking organizations in order to evade LPR cameras, so that the vehicles cannot be tracked as they travel throughout the country;

7.    The Kia's registration was less than a month old;

8.    Tanya displayed excessive nervousness. She repeatedly engaged in "nervous chatter" and "rambling conversation," volunteered information without being asked, frequently led the conversation, and often diverted from one topic to another;

9.    Tanya stated that Defendants were traveling to New York City, which is a known source and consumption city for narcotics;

10.    Defendants had suspicious travel plans—they had recently found out that the concert to which they were traveling had been canceled, Tanya was unable to provide the location of concert, and they had no hotel accommodations. Furthermore, the concert was supposed to have occurred the day prior to the traffic stop, at a time when Defendants were not yet in Pennsylvania, let alone New York City;

11.    The Kia was a recently purchased salvage vehicle—Tanya did not know how much it had cost or from whom Bryce had purchased it. From training and experience, Corporal Conrad believes that drug trafficking organizations frequently utilize salvage vehicles due to their cost effectiveness and because such vehicles often must be repaired, and hidden compartments can therefore be built into the vehicles without arousing suspicion; and

12.    Tanya had a significant criminal history, including multiple felony drug convictions.[59]

The Court concludes that these facts collectively provide reasonable suspicion that Defendants may have been transporting narcotics, which provided justification for Corporal Conrad to extend Defendants' detention beyond the initial traffic stop. Certainly, there is nothing remarkable about many of the facts taken in isolation, such as the fact that Defendants were driving a plain Kia Forte, were driving on Interstate 80, that the Kia was a salvage vehicle registered in California near the border with Mexico, or that they were headed to New York City. However, "[t]hough the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they . . . serve to eliminate a substantial portion of innocent travelers"[60] and those facts cumulatively indicated that Defendants may have been

---

[59]   Corporal Conrad testimony at suppression hearing; Doc. 66-1 at 7.
[60]   *Mathurin*, 561 F.3d at 174 (internal quotation marks omitted).

transporting narcotics.[61] This suspicion would have been greatly amplified once Corporal Conrad spoke with Bryce, who provided a markedly different story regarding Defendants' travel plans than that which had been provided by Tanya.[62]

Defendants nevertheless assert that the traffic stop was unreasonably extended, largely in light of the Honorable Malachy E. Mannion's recent decision in *United States v. Horsford*.[63] I find that decision distinguishable from this matter. In *Horsford*, police initiated a lawful traffic stop and informed the driver that a warning would be issued.[64] The police officer then asked the driver to exit his vehicle and go to the officer's patrol vehicle, where the officer began to ask the driver questions related to a potential drug investigation, rather than the traffic stop.[65] At that point, there was no reasonable suspicion that the driver was engaged in criminal activity, yet the officer continued to question the driver on matters unrelated to the traffic stop.[66]

---

[61]  *Cf. United States v. Givan*, 320 F.3d 452, 458-59 (3d Cir. 2003) (finding that officer had reasonable suspicion sufficient to extend traffic stop where officer observed that (1) the driver had been speeding, (2) the driver was operating a motor vehicle that had been rented less than 24 hours earlier in Michigan, (3) the estimated driving time from Michigan to New York City and back to the site of arrest was approximately 17 hours, (4) it is a common practice of drug dealers from other states to make non-stop trips to New York City and back to purchase drugs, (5) the driver appeared nervous and fidgety and was talking often and shuffling his feet, and (6) the driver and his passengers provided conflicting stories about their travel).

[62]  Doc. 66-1 at 10.

[63]  No. 3:21-CR-243, 2022 WL 2177447 (M.D. Pa. June 16, 2022).

[64]  *Id.* at *10.

[65]  *Id.*

[66]  *Id.* at *10-11.

Within eleven minutes of the stop, the officer had issued a warning, but nevertheless continued to question the driver under the guise that the officer was still preparing the warning.[67] Notably, the officer did not give the warning to the driver until twenty-two minutes after it was issued.[68] And only after the warning had been issued did the officer conclude that the driver and his passenger had given contradictory accounts of their travel plans, which made the officer suspicious that the two were engaged in drug trafficking.[69] Because all of the information that gave the officer reasonable suspicion that the driver was engaged in drug trafficking arose after the officer unreasonably extended the traffic stop, Judge Mannion found that the stop was unconstitutionally prolonged, and concluded that any evidence seized as a result must be suppressed.[70]

In contrast, as discussed above, Corporal Conrad did not unreasonably extend the traffic stop during its initial approximately thirteen and one-half minutes as he spoke with Tanya while running her driver's license information, checking the Kia's registration, and performing other tasks.[71] Although such tasks ordinarily would not take so long to accomplish, they were prolonged by the poor cellular connectivity at the location, and the video footage of the stop confirms that Corporal Conrad was working on those tasks during the entirety of his conversation with Tanya. Therefore,

---

[67]   *Id.* at *11.
[68]   *Id.* at *6.
[69]   *Id.* at *5, 10-11.
[70]   *Id.* at *12.
[71]   Corporal Conrad testimony at suppression hearing.

in contrast to *Horsford*, here Corporal Conrad obtained the majority of the information supporting his reasonable suspicion that drug trafficking was occurring prior to completing the tasks related to the purpose of the traffic stop.

Because Corporal Conrad had sufficient cause to keep Defendants detained during the duration of the traffic stop, the only remaining question is whether there was probable cause to search the Kia. Corporal Conrad's use of a certified drug detection canine to conduct a free air sniff of the exterior of the Kia, an action that indisputably did not violate Defendants' rights,[72] provided such probable cause after the canine displayed alert behavior.[73] Consequently, the Court finds that the search of the Kia was lawful, and the motion to suppress any evidence seized will be denied.

### B.    Whether Statements Should be Suppressed

Finally, Defendants assert that any statements made during the traffic stop should be suppressed, as they were effectively in custody and were not given their *Miranda* warnings until forty-six minutes into the stop.[74] In *Miranda*, the United States Supreme Court held that, pursuant to the Fifth Amendment's privilege against self-incrimination, a person in custody and subjected to interrogation must "first be

---

[72] *See Illinois v. Caballes*, 543 U.S. 405, 410 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment").

[73] *See United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010) ("It is also well-established that, looking at the totality of the circumstances, a dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search the car without a warrant").

[74] Doc. 41 at 6-7.

informed in clear and unequivocal terms that he has the right to remain silent" and "that anything said can and will be used against the individual in court," and be informed of his "right to consult with counsel prior to questioning," the right "to have counsel present during any questioning if the defendant so desires," and that "if he is indigent a lawyer will be appointed to represent him."[75] The Constitution "prohibits a prosecutor from using 'statements . . . stemming from custodial interrogation'" in the absence of *Miranda* warnings.[76]

A suspect is only "'in custody' for *Miranda* purposes when there is 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"[77] "The Supreme Court has held, however, that a roadside interrogation of a motorist pulled over during a traffic stop is not a 'formal arrest'" as a driver expects a "'presumptively temporary and brief' encounter in which 'he may be given a citation' and 'in the end most likely will be allowed to continue on his way.'"[78] "This is so notwithstanding 'the aura of authority surrounding an armed, uniformed officer' during a traffic stop 'and the knowledge that the officer has some discretion in deciding whether to issue a citation.'"[79] "*Miranda* instead comes into play during a traffic stop 'as of the moment the suspect is formally placed under arrest.'"[80]

---

[75] *Miranda,* 384 U.S. at 467-70, 473.

[76] *Renda v. King*, 347 F.3d 550, 557 (3d Cir. 2003) (quoting *Miranda,* 384 U.S. at 444).

[77] *United States v. Ley*, 876 F.3d 103, 108 (3d Cir. 2017) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

[78] *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984) (ellipses omitted)).

[79] *Id.* at 109 (quoting *Berkemer*, 468 U.S. at 438).

[80] *Id.* (quoting *Berkemer*, 468 U.S. at 434 (brackets omitted)).

Here, Defendants were subject to a lawful traffic stop and, accordingly, Corporal Conrad was not required to provide them with *Miranda* warnings until he placed them under arrest. Corporal Conrad placed Defendants under arrest after his canine provided positive signals for narcotics, and he immediately provided Defendants with *Miranda* warnings. Consequently, Defendants' *Miranda* rights were not violated, suppression of any pre-*Miranda* statements is unwarranted, and the motion to suppress such statements will be denied.

## III.  CONCLUSION

For the foregoing reasons, the Court concludes that Defendants' Fourth Amendment rights were not violated, and their joint motion to suppress will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge